IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

RON BROWN,

     Plaintiff,

v.

LIFE UNIVERSITY, INC.,

     Defendant.

CIVIL ACTION FILE NO.
1:23-cv-02487-MLB-LTW

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION

Plaintiff Ron Brown filed this case on June 2, 2023, asserting claims against Defendant Life University for race discrimination and retaliation in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, *et seq.*  [Doc. 1].  The case is presently before the Court on Defendant's Motion for Summary Judgment brought pursuant to Federal Rule of Civil Procedure 56.  [Doc. 44].

# I.    <u>FACTS</u>[1]

The following facts are deemed to be true for the purpose of evaluating Defendant's summary judgment motion.  Defendant Life University's campus is on a 110-acre property maintained by its Grounds Department.  [Doc. 44-2, Defendant's Statement of Undisputed Material Facts ("DSMF") ¶ 1].  Plaintiff, a Black male, worked in the Grounds Department, first as a groundskeeper and then as Grounds Supervisor, from March 2021 to August 22, 2022.  [Doc. 56-3, Plaintiff's Statement of Material Facts ("PSMF") ¶¶ 1-3].  In the latter position, Plaintiff supervised four to five Black male employees.  [<u>Id.</u> ¶ 3].  Plaintiff's direct supervisor was Assistant Facilities Manager Javier Cabanas, a Hispanic male who started working for Defendant in 1995. [<u>Id.</u> ¶¶ 4-5; DSMF ¶ 12].  Cabanas's direct supervisor was Director of Facilities and Grounds Department Head Colin Hilley.  [PSMF ¶ 6; DSMF ¶ 2].

Plaintiff's claims in this case raise issues about Defendant's timekeeping policy for long-term and temporary employees, a combination of which were used to staff the Grounds Department.   [<u>See</u> Doc. 1 ¶¶ 15, 20].   The policy required long-term employees to enter their own time into ADP, a software system Defendant used to

---

[1] The facts are taken from Defendant's Statement of Undisputed Material Facts ("DSMF") [Doc. 44-2], Plaintiff's Response ("Pl.'s Resp.") to DSMF [Doc. 56-2], Plaintiff's Statement of Additional Material Facts ("PSMF") [Doc. 56-3], and Defendant's Response ("Def.'s Resp.") to PSMF [Doc. 59-1].

manage time and attendance. [DSMF ¶¶ 6-8]. Supervisors could enter time into ADP on behalf of their employees, but they generally used their own ADP login credentials to do so, such that the system reflected that the supervisor rather than the employee entered the time. [Id. ¶¶ 9-10]. Nevertheless, if a supervisor used an employee's ADP login credentials to make a time entry, it would appear in the system as if the employee personally entered the time. [Pl.'s Resp. ¶ 10]. Temporary employees reported their time on paper timesheets that were submitted to an outside contractor that billed Defendant for the time they worked. [DSMF ¶ 5]. Cabanas was responsible for approving timesheets submitted by the temporary employees he supervised and ensuring those timesheets were accurate. [Pl.'s Resp. ¶ 5].

Cabanas frequently berated and criticized Black employees in the Grounds Department, raising his voice at Black employees, singling out Black employees for criticism while praising non-Black employees for the same work, and referring to Black employees as "niggers" and "lazy." [PSMF ¶¶ 12, 14]. In addition, Cabanas often falsely accused Plaintiff and other Black employees of stealing time or submitting false timesheets. [Id. ¶ 16].[2] Cabanas also denied Black employees the opportunity to work overtime, while offering such opportunities to non-Black employees. [Id. ¶ 9].

---

[2] Defendant urges the Court to disregard Plaintiff's declaration testimony on this and other points, arguing that the declaration contradicts Plaintiff's deposition. [Def.'s Resp. ¶¶ 8, 16, 35-37]. A court is allowed "in limited circumstances" to disregard a

Plaintiff repeatedly complained to Facilities Director Hilley, Grounds and Operations Manager Kelly Reade, Human Resources Manager Monica Ward, and Operations Vice President Bill Jarr about Cabanas's use of racial slurs and other race-based mistreatment of Black employees in the Grounds Department. [Id. ¶¶ 7, 10-11, 13, 15, 17-19]. For example, Plaintiff verbally complained to Reade and Jarr in November 2021 that Cabanas was denying overtime to Black employees, and he followed his complaint up with an email to Ward on November 20, 2021, repeating the overtime allegation. [Id. ¶ 10]. Ward discussed the overtime issue with Plaintiff, but Defendant did not otherwise respond to any of Plaintiff's complaints, which continued through late July or August 2022. [Id. ¶¶ 11, 18-19, 31].

During Plaintiff's tenure with Defendant, it was a common practice for Grounds Department employees to borrow equipment from the Department for personal use.

_____

declaration that "without explanation . . . flatly contradicts [the declarant's] own prior deposition testimony for the transparent purpose of creating a genuine issue of fact where none existed previously." Furcron v. Mail Ctrs. Plus, LLC, 843 F.3d 1295, 1306 (11th Cir. 2016). This rule, applicable when the court is faced with a "sham" declaration, is "applied sparingly." Id. at 1307 (quotation marks omitted). See also Bethancourt v. Wal-Mart Stores East, LP, No. 1:22-cv-4211-TWT-CCB, 2024 WL 4451754 at *3 (N.D. Ga. July 3, 2024) (declining to apply the sham affidavit rule where the plaintiff's declaration did not "clearly contradict her deposition testimony"). Here, Plaintiff's declaration supplements and clarifies his deposition testimony rather than contradicting it. Accordingly, there is no basis for disregarding the declaration under the sham affidavit rule. See Furcron, 843 F.3d at 1306.

[Id. ¶ 22; Def.'s Resp. ¶ 22].  Plaintiff sometimes borrowed equipment as well, but only after getting approval from Cabanas.  [PSMF ¶ 20].  In April 2022, Hilley learned that Plaintiff had been seen loading Department equipment and gasoline into his personal truck.  [DSMF ¶ 20].  When confronted, Plaintiff told Hilley that: (1) Cabanas gave him permission to borrow the equipment and gasoline, (2) he replenished the gasoline the next day, (3) he did not know borrowing equipment was against policy if it was done with supervisor approval, and (4) such borrowing was a common practice in the Department.  [Pl.'s Resp. ¶¶ 20-21; PSMF ¶¶ 21-24, 27].  Hilley then questioned Cabanas, who admitted that he gave Plaintiff permission to borrow the equipment and gasoline.  [PSMF ¶ 25].  Despite confirming Cabanas's approval, Hilley issued a final written warning to Plaintiff in May 2022 for borrowing equipment for personal use. [Id. ¶ 23].  Hilley did not discipline Cabanas for approving the unauthorized borrowing or take any action against other Grounds Department employees who engaged in the practice both before and after Plaintiff received the May 2022 warning.  [Id. ¶¶ 25-27].

On August 11, 2022, Plaintiff took the day off work for health reasons after notifying his managers by a text message stating, "I'm not going to make it in today." [Id. ¶ 28].  The next day, August 12, 2022, Plaintiff left work around 8:24 a.m. after sending text messages to Cabanas and Hilley notifying them that he was going to the doctor "to get checked out."  [Id. ¶ 29].  Later that day, Plaintiff gave Cabanas and

Hilley the test results he received during his visit to the hospital while he was absent from work.  [Id.].  Upon his return to work the following Monday, Plaintiff gave Cabanas and Hilley a doctor's note to excuse his absence on August 12, 2024.  [Id. ¶ 30].

Around the same time in August 2022, Plaintiff overheard Adamari Obregon, a temporary Hispanic employee, bragging to coworkers that her boyfriend, Cabanas, was helping her get paid for hours she did not work by signing off on false timesheets.  [Id. ¶ 32].  Specifically, Obregon bragged that Cabanas allowed her to take nearly a month off work and still get paid.  [Id. ¶ 34].  Plaintiff raised the issue with Cabanas, who explained that Obregon had been out sick during that month.  [Id.].  However, Plaintiff subsequently learned from the outside contractor that temporary employees were not eligible for sick leave.  [Id. ¶ 35].  Plaintiff relayed this information to Cabanas, who told Plaintiff not to worry and that he would "take care of it."  [Id. ¶¶ 36-37].

Shortly thereafter, Plaintiff was covering for Cabanas's time review duties when he came across a timesheet submitted by Obregon in which she reported working hours that Plaintiff knew for a fact she had not worked.  [Id. ¶ 38].  Plaintiff brought the timesheet to Hilley and Reade and complained to them that Cabanas was engaging in racial favoritism by approving false timesheets submitted by Obregon, a Hispanic employee, while baselessly accusing Black employees of stealing time.  [Id. ¶¶ 39-40;

6

Pl.'s Resp. ¶ 22].  Plaintiff also told Hilley and Reade that Cabanas and Obregon were in a romantic relationship.  [PSMF ¶ 41].  Obregon admitted during Hilley's ensuing investigation that she had falsified her timesheets, and she was terminated at Hilley's direction on August 15, 2022.  [Id. ¶¶ 42-43].  Defendant apparently did not discipline Cabanas for approving Obregon's admittedly false timesheets, although Cabanas was responsible for ensuring their accuracy.  [See id. ¶ 33].

On August 17, 2022, two days after Obregon was terminated, Plaintiff's ADP login credentials were used to make a time entry falsely indicating that Plaintiff had worked a full eight-hour shift on August 12, 2022, the day Plaintiff had advised Cabanas and Hilley he was taking off work for medical reasons. [Id. ¶ 44].  Plaintiff testified that he did make the false time entry for August 12, that he only ever input time into the ADP system that he in fact worked, and that Cabanas had Plaintiff's ADP login credentials.  [Id. ¶¶ 45- 47].  Because Plaintiff did not personally make the false time entry, and because Cabanas was the only person besides Plaintiff with access to Plaintiff's ADP login credentials, Plaintiff concluded that Cabanas must have used Plaintiff's credentials to log into the system and make the false August 12 entry without Plaintiff's approval.[3]  [Id. ¶ 48].

---

[3] Defendant claims that Plaintiff must have made the August 12 time entry because the ADP system requires two-factor authentication, but Defendant does not dispute that a person with Plaintiff's ADP password and access to his email could

Hilley testified that on August 17, 2022, the same day the false time was entered in ADP, he personally witnessed Plaintiff "ruthlessly berating" a temporary employee named Chris. [PSMF ¶¶ 58, 63; DSMF ¶ 38]. Describing the interaction he claimed to have observed, Hilley stated that: (1) Plaintiff yelled and used profanity, (2) Chris was in tears during his conversation with Plaintiff, and (3) Chris left work immediately after the conversation and never returned to Defendant's worksite. [Pl.'s Resp. ¶ 38]. Plaintiff argues Hilley could not have genuinely believed he berated or otherwise behaved inappropriately during his interaction with Chris, stating that: (1) he did not yell, raise his voice, or use profanity, (2) Chris did not cry during the conversation, and (3) Chris immediately left work because the conversation occurred at the end of a shift, but he returned to work a few days later and ultimately quit his job with Defendant for other reasons. [Id.; PSMF ¶¶ 60-62].

On August 22, 2022, Cabanas reported to Hilley that Plaintiff had falsified his time records by entering eight hours of time worked on August 12, 2022, into the ADP system. [PSMF ¶ 49]. Hilley testified that he immediately relayed the report to Ward, and the record reflects that Hilley sent Ward an email at 10:36 a.m. on August 22

_____

bypass the authentication requirement. [See Def.'s Resp. ¶¶ 46, 48]. Plaintiff's testimony that Cabanas had his "ADP login credentials" raises a question of fact as to whether Cabanas had Plaintiff's password and access to his email, such that Cabanas was able to access the ADP system and make a time entry on behalf of Plaintiff.

advising her that Plaintiff may have falsely entered his time into ADP and requesting that she audit Plaintiff's ADP records. [Id.]. In connection with the request, Hilley gave Ward Plaintiff's text messages showing that he had called out sick on August 12, which messages made it clear that Plaintiff himself had created an extensive written record of his absence from work that day and the reason for it. [DSFM ¶ 27; Pl.'s Resp. ¶ 27]. Ward testified that she investigated Cabanas's report by comparing Plaintiff's own text messages about his absence from work on August 12 with ADP time records indicating that Plaintiff worked eight hours that day. [PSMF ¶ 50; Def.'s Resp. ¶ 50; DSMF ¶¶ 28-29; Pl.'s Resp. ¶¶ 28-29].

Ward and Hilley subsequently called Plaintiff into a meeting at approximately 11:00 a.m. on August 22, 2022, and read from an already typewritten letter stating that Plaintiff was terminated "effective immediately" based on Cabanas's report and Plaintiff's inappropriate interaction with Chris a few days prior. [PSMF ¶¶ 55-56; DSMF ¶ 39]. Plaintiff told Hilley and Ward during the meeting that he did not enter the false time for August 12, and that Cabanas had his ADP login credentials and entered the false time to get back at Plaintiff for his recent report of racial favoritism that got Cabanas's girlfriend fired. [PSMF ¶¶ 64-65; Pl.'s Resp. ¶ 42]. Plaintiff also reminded Hilley and Ward that Plaintiff himself had documented his absence from work on August 12 and asked them, "Why would I report work on a sick day where I

clearly told you I was off and even gave you a doctor's note?" [PSMF ¶ 66; Pl.'s Resp. ¶ 42]. As for his interaction with Chris, Plaintiff told Hilley and Ward that he never raised his voice at Chris and that his crew told him that Chris quit because he found a better paying job, not because Plaintiff criticized his work. [Id. ¶ 67; Pl.'s Resp. ¶ 42]. Nevertheless, Defendant terminated Plaintiff's employment "effective immediately" on August 22, 2022. [PSMF ¶ 55].

Following Plaintiff's termination, Ward investigated whether other individuals in the Grounds Department had falsified their time records. [DSMF ¶ 31]. Ward's investigation revealed that Cabanas sometimes entered personal leave on behalf of the employees he supervised, which was against Defendant's policy requiring employees to enter their own time. [Id. ¶ 32]. On Ward's recommendation, Cabanas was given a two-day suspension for "ADP time tampering and insubordination." [DSMF ¶ 15; Pl.'s Resp. ¶ 15]. This was the second time Cabanas was disciplined since he started working for Defendant in 1995, the first incident involving a two-day suspension in November 2013 after a verbal altercation with another employee. [DSMF ¶ 14]. After the second suspension in 2022, Cabanas resigned from his employment with Defendant. [Id. ¶ 16].

Plaintiff subsequently filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging race discrimination and retaliation in violation of Title

VII in connection with his termination.  [Doc. 1 ¶ 5].  After the EEOC issued a notice of right to use, Plaintiff filed the complaint in this case asserting race discrimination and retaliation claims under Title VII and § 1981.  [Id.].  In support of his claims, Plaintiff alleges that during his employment with Defendant, his supervisor Cabanas directed racial slurs and insults at Plaintiff and other Black employees, falsely accused Plaintiff and other Black employees of stealing time and equipment but ignored actual misconduct by non-Black employees, and denied Black employees the opportunity to work overtime while giving such opportunities to non-Black employees.  [Id. ¶¶ 12-16, 29-32].  Plaintiff claims he complained about Cabanas's conduct to upper-level managers in the Grounds Department and Human Resources but that his complaints were ignored, and that he ultimately was terminated after reporting to a manager that a non-Black temporary employee was falsifying her time records.  [Id. ¶¶ 17-19, 23-24, 36].  Defendant moves for summary judgment as to Plaintiff's race discrimination and his retaliation claim.  [Doc. 44].

## II.    **SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the initial burden of asserting the basis for its motion, which it may discharge by "showing—that is, pointing out to

the district court—that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986) (quotation marks omitted).  Assuming this burden is met, the non-moving party is then required to "go beyond the pleadings" and present competent evidence showing that there is a genuine disputed issue of material fact for trial.  Id. at 324 (quoting Fed. R. Civ. P. 56(e)).

A fact is material when it is identified as such by the controlling substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  To show that an issue is genuinely disputed, the nonmoving party "must present evidence beyond the pleadings showing that a reasonable jury could find in its favor" as to the issue.  Fickling v. United States, 507 F.3d 1302, 1304 (11th Cir. 2007) (citing Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990)).  An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." Anderson, 477 U.S. at 249-50.  To determine whether there is a genuine issue of material fact that precludes summary judgment, the Court must "construe the evidence in the light most favorable to the non-moving party."  Buckley v. Sec'y of Army, 97 F.4th 784, 792 (11th Cir. 2024).

## III.   **DISCUSSION**

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of

employment, because of such individual's race[.]" 42 U.S.C. § 2000e-2(a)(1).  Section

1981, U.S. Code Title 42, similarly prohibits discrimination based on race "in the

making and enforcement of public and private contracts, including employment

contracts."  Ossmann v. Meredith Corp., 82 F.4th 1007, 1014 (11th Cir. 2023)

(quotation marks omitted).[4]  Both Title VII and § 1981 give rise to a cause of action to

redress race discrimination in the workplace.  See Bryant v. Jones, 575 F.3d 1281, 1296

n.20 (11th Cir. 2009) (explaining that § 1981 or Title VII both support discrimination

claims).  In addition to prohibiting discrimination, Title VII forbids an employer from

retaliating against an employee for opposing race discrimination.  42 U.S.C. § 2000e-

3(a).  See also Tolar v. Bradley Arant Boult Commings, LLP, 997 F.3d 1280, 1289

(11th Cir. 2021) (setting out the legal framework governing Title VII retaliation

claims).  Although § 1981 does not expressly mention retaliation, courts have found

that the statute encompasses retaliation claims in the same manner as Title VII.  See

Bryant, 575 F.3d at 1301 (citing CBOCS West, Inc. v. Humphries, 553 U.S. 442, 457

(2008)).

　　　　Race discrimination and retaliation claims brought under Title VII and § 1981

"are subject to the same standards of proof and employ the same analytical framework."

---

[4] Section 1981 provides that: "All persons within the jurisdiction of the United
States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by
white citizens[.]"  42 U.S.C. § 1981(a).

13

Id. at 1296 n.20.  See also Brown v. Ala. Dep't of Transp., 597 F.3d 1160, 1174 n.6 (11th Cir. 2010) ("The analysis under [§ 1981] . . . mirrors that under Title VII.").  To prevail under either statute, a plaintiff must present evidence of intentional discrimination and/or retaliation.  Lewis v. City of Union City, Ga., 918 F.3d 1213, 1220 (11th Cir. 2019).  Such evidence can be direct or circumstantial.  Id. at 1220 n.6.

When a plaintiff relies solely on circumstantial evidence to support his claim, courts often apply the burden-shifting framework set forth in McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973) to determine whether there is sufficient evidence of intentional discrimination or retaliation for the claim to survive a motion for summary judgment.  See id. at 1217 (explaining that the plaintiff could raise a disputed issue of fact as to intentional discrimination by "navigating the now-familiar three-part burden-shifting framework established by the Supreme Court" in McDonnell Douglas); Tolar, 997 F.3d at 1297-98 (applying McDonnell Douglas to a retaliation claim based on circumstantial evidence).  Under McDonnell Douglas, the plaintiff has the initial burden to establish a *prima facie* case of discrimination or retaliation.  Lewis, 918 F.3d at 1217.  Assuming the plaintiff makes out a *prima facie* case, "the burden shifts to the defendant to articulate a legitimate, nondiscriminatory [or nonretaliatory] reason for its actions."  Id. at 1221.  If the employer meets that burden, the plaintiff "must then demonstrate that the defendant's proffered reason was merely a pretext for

unlawful discrimination [or retaliation]." Id.

As the Eleventh Circuit recently emphasized, the McDonnell Douglas analysis is not "a stand-in for the ultimate question of liability" in employment discrimination cases, but rather "an evidentiary framework that shifts the burden of production between the parties to figure out if the true reason for an adverse employment action" was unlawful. Tynes v. Fla. Dep't of Juvenile Justice, 88 F.4th 939, 941 (11th Cir. 2023). Aside from McDonnell Douglas, a plaintiff's discrimination or retaliation claim will always survive summary judgment if the plaintiff presents enough circumstantial evidence to raise "a triable issue concerning the employer's discriminatory [or retaliatory] intent." Jenkins v. Nell, 26 F.4th 1243, 1250 (11th Cir. 2022) (quotation marks omitted). The standard that applies to this method of overcoming summary judgment is sometimes referred to as the "convincing mosaic standard." McCreight v. Auburnbank, 117 F.4th 1322, 1334 (11th Cir. 2024) ("McDonnell Douglas and the convincing mosaic standard are two ways to approach the same question: whether the plaintiff has put forward enough evidence for a reasonable jury to conclude that illegal discrimination [or retaliation] occurred[.]" (quotation marks omitted)).

Defendant argues it is entitled to summary judgment because there is no direct evidence of race discrimination or retaliation and Plaintiff cannot establish a *prima facie* case of either, as required to prevail under McDonnell Douglas. [Doc. 44-1 at 9-

13]. Assuming Plaintiff can meet his burden at the *prima facie* stage of the analysis, Defendant contends that his claims still fail because it is undisputed Plaintiff was fired for two legitimate non-discriminatory and non-retaliatory reasons: (1) a time policy violation, and (2) inappropriate behavior toward a subordinate. [Id. at 13-17]. According to Defendant, Plaintiff has not presented sufficient evidence of pretext to rebut these reasons. [Id.].

Contrary to Defendant's argument, there are material issues of fact that preclude summary judgment as to Plaintiff's retaliation and discrimination claims. Proceeding under McDonnell Douglas, Plaintiff makes a *prima facie* showing that he was terminated in retaliation for complaining about race discrimination and racial favoritism, and he presents sufficient evidence to raise a question of fact as to whether Defendant's asserted legitimate reasons for his termination are pretextual and the "true reason" for his termination was retaliation. See Tynes, 88 F.4th at 941. As to his race discrimination claim, notwithstanding Plaintiff's inability to prevail under McDonnell Douglas, Plaintiff presents enough circumstantial evidence to create a "triable issue of fact" as to whether he was terminated as a direct result of Cabanas's well-documented racial animus. See Jenkins, 26 F.4th at 1250.

## A.    Plaintiff's Retaliation Claim

A plaintiff can make out a *prima facie* case of retaliation for purposes of McDonnell Douglas by showing that: "(1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) he established a causal link between the protected activity and the adverse action." Bryant, 575 F.3d at 1307-08. Establishing these three elements raises a "presumption that the adverse action was the product of an intent to retaliate." Id. at 1308. The defendant can rebut that presumption, by "articulating a legitimate, [non-retaliatory] reason for the adverse employment action." Id. Assuming the defendant satisfies that requirement, the plaintiff "has a full and fair opportunity" to avoid summary judgment by presenting evidence that the "proffered reason was merely a pretext to mask" retaliation. Id.

Regarding Plaintiff's *prima facie* case of retaliation, it is undisputed that Plaintiff engaged in protected activity by repeatedly complaining about race discrimination in the Grounds Department, and that he suffered an adverse employment action when he was terminated. [See PSMF ¶¶ 10, 13, 15, 17, 19, 31, 54-55]. As noted, Plaintiff last complained about Cabanas's use of racial slurs, race-based mistreatment of Black employees, and racial favoritism with respect to overtime and timekeeping practices in late July or August 2022, just a few weeks or at the most one month prior to his termination on August 20, 2022. [Id. ¶ 31]. Accordingly, the causal link element of

17

Plaintiff's *prima facie* case is satisfied by the close temporal proximity between Plaintiff's protected activity and the challenged adverse action.  See Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007) ("The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action.").  In the absence of other evidence of causation, temporal proximity "must be very close" to establish the requisite causal link between protected activity and an adverse action.  Id. (noting that a "three to four month disparity . . . is not enough").  But that requirement clearly is met here, where Plaintiff was terminated within a few weeks or at the most one month of his complaints about race discrimination.  See Robinson v. LaFarge N. Am., Inc., 240 F. App'x 824, 829 (11th 2007) (holding that the plaintiff established a *prima facie* case of retaliation where his demotion "occurred only about two months after he filed a grievance" alleging discrimination).

Defendant's burden at the second stage of the McDonnell Douglas analysis is one of production rather than persuasion, and it is "exceedingly light." Tolar, 997 F.3d at 1297 (quotation marks omitted).  Specifically, Defendant must "articulate a legitimate, nonretaliatory reason for its adverse action." Id.  Defendant proffers two such reasons: (1) Hilley and Ward determined that Plaintiff falsely claimed to have worked hours he did not in fact work, and (2) Hilley witnessed Plaintiff inappropriately

berate a temporary employee.  [DSMF ¶¶ 38-39].  This explanation adequately rebuts the presumption arising from Plaintiff's *prima facie* showing, shifting the onus back onto Plaintiff to present evidence that Defendant's asserted reasons for his termination are "merely a pretext" to mask the real reason: retaliation for complaining about discrimination.  See Gogel v. Kia Motors Mfg. of Ga., Inc., 967 F.3d 1121, 1136 (11th Cir. 2020) (explaining that the defendant met its burden at the second stage of McDonnell Douglas by explaining that it fired the plaintiff not because she filed an EEOC charge but because she recruited another employee to sue the company, rendering her ineffective in her management role with the company).

To establish pretext, Plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Defendant's proffered explanation "that a reasonable factfinder could find [the explanation] unworthy of credence."  Id. (quotation marks omitted).  Further, "[a] reason is not pretext for retaliation unless it is shown both that the reason was false, and that retaliation was the real reason."  Id. (quotation marks omitted, emphasis in original).  Thus, in addition to evidence from which a jury could reasonably conclude that Defendant's asserted reasons for firing him were false, Plaintiff also must point to evidence showing that "retaliation was the real reason" he was fired.  Id.

Plaintiff satisfies both evidentiary requirements here. First, there is an abundance of evidence that casts doubt on the specific reasons articulated by Defendant for terminating Plaintiff. As to the time policy violation, Cabanas reported the alleged violation on August 22, 2022, just a week after Cabanas's girlfriend Obregon was terminated following Plaintiff's complaint that Cabanas had approved Obregon's false timesheets. [PSMF ¶¶ 43, 49]. In support of the reported violation, Cabanas cited an ADP time entry made on August 17, 2022, two days after Obregon's termination, falsely indicating that Plaintiff worked a full eight-hour shift on August 12, 2022. [Id. ¶ 44]. Hilley and Ward were aware of Plaintiff's complaint involving Obregon's timesheet, its implications for Obregon, and the relationship between Obregon and Cabanas. [Id. ¶¶ 39-40, 43]. A jury could find that they also must have known Cabanas's report against Plaintiff was false, given its highly suspect timing and source, but that they used the report as an excuse to get rid of a problematic employee who continued to complain about discrimination in the workplace. See Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1364 (11th Cir. 1999) (finding a question of fact as to pretext based, in part, on evidence showing that a written reprimand accusing the plaintiff of poor performance "was a fabrication designed to justify his eventual firing" (quotation marks omitted)).

Even if the implausibility of Cabanas's accusation was not immediately apparent, Plaintiff made it so when he pointedly asked Hilley and Ward during the August 22 meeting, "Why would I report work on a sick day where I clearly told you I was off and even gave you a doctor's note?" [Id. ¶ 66]. Plaintiff then stated to Hilley and Ward that he did not make the false August 12 time entry, and that he believed Cabanas made the entry to get back at him for his role in Obregon's termination. [Id. ¶ 64]. Plaintiff further explained that Cabanas had his ADP login credentials, which would have enabled Cabanas to make an ADP time entry that appeared to have been made by Plaintiff. [Id. ¶ 65]. Hilley and Ward's refusal to consider the information provided by Plaintiff casting doubt on Cabanas's report, given the suspect nature of the report to begin with, is further indication of pretext. See Jackson v. Agency for Persons with Disabilities, 608 F. App'x 740, 742 (11th Cir. 2015) (noting that when an employer takes an adverse action based on reported misconduct, the pretext inquiry centers on whether the employer "honestly believed the employee had done wrong"); Grovner v. Ga. Dep't of Nat. Res., 646 F. App'x 805, 809 (11th Cir. 2016) ("The pretext inquiry focuses on whether the employer gave an honest explanation for its behavior.").

Also relevant is that, despite the obvious issues with Cabanas's report, Hilley and Ward terminated Plaintiff within as little as half an hour of receiving it. [Id. ¶¶ 49,

56]. Specifically, Cabanas reported the alleged time violation to Hilley on the morning of August 22, 2022, and Hilley "immediately" relayed the report to Ward in an email sent at 10:36 a.m. that same morning. [Id. ¶ 49]. Hilley and Ward subsequently called Plaintiff into a meeting as early as 11:00 a.m. and read to Plaintiff from an already typewritten letter announcing his termination "effective immediately." [Id. ¶ 56]. Based on the swiftness of Plaintiff's termination and the cursory investigation that preceded it, a jury could reasonably infer that Hilley and Ward were not genuinely concerned about whether Plaintiff falsified his August 12 time entry but instead looking for an excuse to fire him. See Donald v. UAB Hosp. Mgmt., LLC, No. 2:14-cv-727-WMA, 2015 WL 5915323 at *7 (N.D. Ala. 2015) (explaining that a jury could find the employer's "cursory investigation" to be evidence that the reason given for the plaintiff's termination "was pretextual").

Defendant correctly notes that Plaintiff cannot establish pretext by simply denying that he falsified his timesheet or quarreling with the wisdom of Defendant's decision to fire Plaintiff based on the genuine belief that Plaintiff falsified his timesheet. [See Doc. 44-1 at 14-15]. That is because the pretext inquiry "centers on the employer's beliefs, not the employee's beliefs." Alvarez v. Royal Atl. Dev., Inc., 610 F.3d 1253, 1266 (11th Cir. 2010). See also Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1471 (11th Cir. 1991) ("[The plaintiff] may have convinced the jury that the

allegations against him were untrue, but he certainly did not present evidence that [the defendant's] asserted belief in those allegations was unworthy of credence."). However, Plaintiff does not rely solely on a denial or subjective reassessment of the seriousness of Cabanas's report to show pretext.  [See Doc. 56 at 14-21].  Instead, Plaintiff presents evidence from which a jury could conclude that Hilley and Ward knew that Plaintiff did not falsify his timesheet as reported by Cabanas, but they nevertheless used Cabanas's report to justify Plaintiff's termination, raising a credible issue about pretext.  See Phillips v. Legacy Cabinets, 87 F.4th 1313, 1324-25 (11th Cir. 2023) ("Because the plausibility of [the defendant's] proffered reason for firing [the plaintiff] depends entirely on disputed issues of fact, the district court did not err in concluding that a reasonable jury could find that this reason was pretextual.").

With respect to Plaintiff's allegedly inappropriate interaction with Chris, Hilley testified that he personally witnessed the interaction, and that he concluded Plaintiff's behavior was unacceptable because Plaintiff "ruthlessly berated" Chris, yelling and using profanity in such a manner that Chris was in tears during the conversation and quit his job with Defendant immediately thereafter.  [DSMF ¶¶ 34-38].  Plaintiff testified, on the other hand, that he did not yell, raise his voice, or use profanity during his conversation with Chris, that Chris did not cry, and that Chris left work immediately thereafter because his shift was over, but he returned to work a few days later and

ultimately resigned for reasons unrelated to the conversation.  [Pl.'s Resp. ¶¶ 34-38].

As Plaintiff points out, either he yelled, used profanity, left Chris in tears, and pushed him to quit his job with Defendant, or he did not.  [See Doc. 56 at 13].  For purposes of summary judgment, the Court must accept the latter.  See Frederick v. Sprint/Un. Mgmt. Co., 246 F.3d 1305, 1311 (11th Cir. 2001) (emphasizing that on summary judgment, the court views the facts in the light most favorable to the nonmoving party, drawing all inference in his favor).  A jury that does the same would be authorized to conclude that Hilley is lying about several key facts concerning Plaintiff's interaction with Chris, and that the Chris-related explanation for firing Plaintiff is thus pretextual. See Phillips, 87 F.4th at 1324-25; see also Hamer v. City of Atlanta, Ga., No. 1:15-cv-00636-ELR-RGV, 2016 WL 10591434 at *14 (N.D. Ga. 2016) ("[P]retext means a lie, specifically a phony reason for some action." (quotation marks omitted)).

Again, Plaintiff's testimony would be insufficient to raise a question of fact as to pretext if it merely showed that Hilley concluded Plaintiff behaved inappropriately based on erroneous facts or a subjectively different interpretation of the undisputed facts.  See Alvarez, 610 F.3d at 1266.  However, Plaintiff presents evidence that directly contradicts the facts upon which Hilley claims to have relied in concluding Plaintiff behaved inappropriately during his interaction with Chris.  [See Pl.'s Resp. ¶¶ 38-39].  Moreover, Defendant cannot evade the resulting factual dispute by claiming

24

Hilley had a "mistaken good faith belief" that Plaintiff engaged in the alleged misconduct, because Hilley claims he personally witnessed the misconduct.  See Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 771 (11th Cir. 2005) (holding that an employee raised an issue of fact as to pretext by denying alleged incidents of unprofessionalism that were within the decisionmaker's "personal knowledge").

Finally, and in addition to the evidence that casts doubt on both specific reasons proffered by Defendant for terminating Plaintiff, there is other, more general circumstantial evidence from which a jury could reasonably infer retaliatory intent on the part of Defendant.  See Phillips, 87 F.4th at 1325 ("The critical decision . . . is whether the plaintiff has created a triable issue concerning the employer's . . . intent." (quotation marks omitted and alteration adopted).  Plaintiff testified that he repeatedly complained about racial discrimination during his tenure with Defendant, telling Hilley, Ward, Reade, and Jarr on multiple occasions that Cabanas used racial slurs, singled out Black employees for criticism and falsely accused them of misconduct, denied Black employees overtime opportunities, and engaged in racial favoritism regarding timekeeping. [PSMF ¶¶ 10, 13, 15, 17, 19, 31].  Besides an isolated interview to address Plaintiff's email advising Ward in November 2021 that Cabanas was denying overtime opportunities to Black employees, Defendant took no action to address Plaintiff's complaints.  [Id. ¶¶ 11, 18-19].  Defendant's failure to respond to

Plaintiff's persistent and serious allegations of race discrimination and racial favoritism in the Grounds Department is one of several "bits and pieces" of evidence "from which an inference" of retaliatory intent might be drawn. See Lewis, 934 F.3d at 1185; see also Perry v. Schumacher Grp. of La., 809 F. App'x 574, 581 (11th Cir. 2020) (holding that the district court erred when it concluded, as a matter of law, that a failure to investigate a discrimination claim cannot serve as evidence of discrimination).

There also is evidence that, even prior to his termination, Plaintiff was singled out for discipline after he began complaining about discrimination in the Grounds Department. [Id. ¶¶ 20-23]. Again, Plaintiff repeatedly complained during his tenure with Defendant about Cabanas's use of racial slurs, criticism and false accusations against Black employees, and denial of overtime to Black employees. [Id. ¶¶ 10, 13, 15, 17]. Plaintiff sent an email to Ward about the overtime issue in November 2021, and he complained to Hilley, Jarr, and Reade several times both before and after email about Cabanas's race-based mistreatment of Black employees. [Id. ¶¶ 13, 15, 17]. In May 2022, following at least some of these complaints, Plaintiff received a final written warning for borrowing equipment although such borrowing was a common practice in the Grounds Department. [Id. ¶¶ 20-23]. Defendant admits that Cabanas was not disciplined for the incident even though he authorized Plaintiff to borrow the equipment. [Id. ¶¶ 25-26]. That Defendant disciplined Plaintiff, an employe who

frequently complained about discrimination, for conduct that Cabanas approved and in which other employees regularly engaged without reprise is another piece of evidence from which a jury could infer retaliatory animus against Plaintiff.  See Damon, 196 F.3d at 1364 (finding that the employer's selective imposition of discipline was evidence of unlawful discriminatory intent); Jones v. City of Heflin, 207 F. Supp. 3d 1255, 1278 (N.D. Ala. 2016) ("Oftentimes sufficient pretext is shown by comparing how a supervisor has treated" employees "who violated the same rule or policy, but who did not oppose discriminatory or retaliatory practices[.]").

Plaintiff last complained about race-based discrimination in late July or August 2022, and he specifically reported during this time that Cabanas was engaging in racial favoritism by approving Obregon's false timesheets while groundlessly accusing Black employees of time theft.  [Id. ¶¶ 31, 39-40].  Defendant terminated Obregon after she admitted during an ensuing investigation that she had submitted false timesheets but again took no disciplinary action against Cabanas, who reportedly had approved at least a month of false time submitted by Obregon.  [Id. ¶¶ 34-35, 39].  When Cabanas accused Plaintiff of falsifying his time just a week after Obregon's termination, Plaintiff was fired within as little as half an hour of the accusation.  [Id. ¶¶ 49, 55-56]. The suspicious timing of Cabanas's accusation, the swiftness of Plaintiff's termination and the cursory nature of the investigation that preceded it, and the general discrepancy

between how Defendant responded to Plaintiff's alleged misconduct and how it responded to allegations of even more serious misconduct involving Cabanas and Obregon are additional pieces of evidence from which a jury could infer a retaliatory intent. See Jefferson v. Sewon Am., Inc., 891 F.3d 911, 925 (11th Cir. 2018) (finding the "suspicious timing of [the plaintiff's] termination, which closely followed [his] complaint" of race discrimination to be evidence of pretext); Hamer, 2016 WL 10591434 at *17 (emphasizing that the "timing of the investigation" into the plaintiff's alleged misconduct "in close proximity to his internal grievance and EEOC charge" was circumstantial evidence of retaliatory intent).

For all the above reasons, the undersigned concludes that Plaintiff has established a *prima facie* case that his termination was retaliatory and in violation of Title VII and § 1981, and that he has presented sufficient evidence of pretext to rebut Defendant's articulated legitimate, non-retaliatory reasons for the termination. Accordingly, it is **RECOMMENDED** that Defendant's summary judgment motion ([Doc. 44]) be **DENIED** as to Plaintiff's Title VII and § 1981 retaliation claim [Doc. 1, Count II].

**B.    Plaintiff's Race  Discrimination Claim**

To establish a *prima facie* case of discrimination under McDonnell Douglas, a plaintiff must show that: (1) he belongs to a protected class; (2) he was qualified for

his job; (3) he suffered an adverse employment action; and (4) he was treated less favorably than a similarly situated employee (or "comparator") outside of his protected class.  Jenkins, 26 F.4th at 1249.  A comparator ordinarily must "have engaged in the same basic conduct or misconduct, be subject to the same employment policies, have the same supervisor(s)" as and "share an employment or disciplinary history" with the plaintiff.  Id.  According to Defendant, the only employee who arguably can serve as a comparator here is Cabanas, and Cabanas was not similarly situated to Plaintiff because he did not have the same employment or disciplinary history as Plaintiff.  [Doc. 44-1 at 10-12].  Specifically,  Defendant points out that Plaintiff worked for Defendant for approximately two years, during which he received a final written warning for improperly borrowing equipment and ultimately was fired for falsifying time, whereas Cabanas worked for Defendant for almost three decades, during which he was disciplined only twice:  once in 2013 for an altercation with another employee, and once in 2022 for the timekeeping violation Ward discovered during her investigation following Plaintiff's termination.  [Id. at 11].

Plaintiff makes no effort to establish a *prima facie* case of race discrimination under McDonnell Douglas, presumably because he cannot identify a comparator.  [See Doc 56 at 21-22].  Instead, Plaintiff emphasizes that satisfying McDonnell Douglas is not the only way for a plaintiff to survive summary judgment in a race discrimination

case.  [Id.].  According to Plaintiff, Defendant's motion for summary judgment should be denied because circumstantial evidence in the record creates a "convincing mosaic" that Defendant intentionally discriminated against Plaintiff based on his race.  [Id. at 22]

As noted above, a plaintiff can survive summary judgment in a § 1981 or Title VII race discrimination case without satisfying the comparator prong of McDonnell Douglas by presenting other "circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." Jenkins, 26 F.4th at 1250 (quotation marks omitted).  A "triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker."  Id. (quotation marks omitted).  A plaintiff proving his case through the convincing mosaic method "may point to any relevant and admissible evidence" that "raises a reasonable inference that the employer discriminated against the plaintiff." Tynes, 88 F.4th at 946 n.2.  Such evidence may include "suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred." Jenkins, 26 F.4th at 1250.  It also may include "systematically better treatment" of employees outside the plaintiff's protected class or evidence that under McDonnell Douglas would be considered "pretext." Id. (quotation marks omitted).

Plaintiff does not present any circumstantial evidence of racially discriminatory animus on the part of Hilley and Ward, the decisionmakers who terminated him. Nevertheless, he argues there is evidence from which a jury could find that his termination was racially motivated based on a "cat's paw" theory. [Doc. 56 at 22]. The "cat's paw" theory provides for liability when the decisionmaker responsible for the challenged adverse action "followed the biased recommendation" of an individual with the requisite discriminatory animus "without independently investigating" the recommendation. Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1332 (11th Cir. 1999). "In such a case, the recommender is using the decisionmaker as a mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus." Id. See also Llampallas v. Mini-Circuits, Lab, Inc. 163 F.3d 1236, 1249 (11th Cir. 1998) ("In a cat's paw situation, the harasser clearly causes the tangible employment action, regardless of which individual actually signs the employee's walking papers."). Plaintiff argues that a reasonable jury could conclude that Hilley and Ward were cat's paws for Cabanas's racially motivated desire to terminate Plaintiff, because Cabanas set the termination into motion by falsifying Plaintiff's ADP time records and reporting the falsification to Hilley, who along with Ward conducted a cursory investigation designed to confirm Cabanas's report with minimal inquiry and no regard for truth of the report. [Doc. 56 at 23-24].

31

There is sufficient evidence in the record to support Defendant's liability for race discrimination under the cat's paw theory asserted by Plaintiff.  Cabanas's racial animus—including his use of racial slurs in the workplace, denial of overtime to Black employees, and false accusations against Black employees, among other things—is undisputed for purposes of summary judgment. [Def.'s Resp. ¶¶ 9-10, 12, 14, 16].  The evidence also supports an inference that Cabanas, although not technically the decisionmaker with respect to Plaintiff's termination, caused the termination.  <u>See Williams v. Ala. Dep't of Transp.</u>, 509 F. Supp. 2d 1046, 1060 (M.D. Ala. 2007) (noting that the biased supervisor, although not the ultimate decisionmaker, "started the disciplinary chain" by reporting the plaintiff's alleged misconduct).  Construing the evidence in the light most favorable to Plaintiff, Cabanas used Plaintiff's ADP login credentials to make a false time entry indicating that Plaintiff worked a full eight-hour shift on August 12, 2022, and then reported to Hilley that Plaintiff had falsified his time for that day.  [PSMF ¶¶ 44-49].  Hilley and Ward called Plaintiff into a meeting within approximately half an hour of Cabanas's report and advised him that he was terminated "effective immediately."  [<u>Id.</u> ¶¶ 49, 55-56].

The determinative issue with respect to cat's paw liability is thus whether Hilley and Ward independently investigated Cabanas's report or instead whether they merely "rubber stamped" it.  <u>See id.</u> ("[W]here the racially-biased recommender is an integral

part of a multi-level decisionmaking process, that bias corrupts the entire process where the decisionmaker merely rubber stamps the recommendation." (quotation marks omitted and alterations adopted)).  For the reasons discussed above in connection with Plaintiff's retaliation claim, a jury could reasonably conclude the latter.  Again, Cabanas reported Plaintiff's alleged time violation to Hilley at approximately 10:36 a.m. on the morning of August 22, 2022, and Ward subsequently "investigated" the report by comparing Plaintiff's own text messages documenting his absence from work on August 12 with ADP time records indicating that Plaintiff worked a full eight-hour shift that day.  [Id. ¶¶ 49-50].  The investigation took approximately half an hour, after which Hilley and Ward called Plaintiff into a meeting and read from an already typewritten letter announcing his termination "effective immediately."  [Id. ¶¶ 49, 56].  Based on these facts, a jury might readily conclude that Hilley and Ward acted merely as a "rubber stamp" for Cabanas's report, thus giving effect to Cabanas's racial animus in terminating Plaintiff.  See Stimpson, 186 F.3d at 1332.

The Eleventh Circuit has explained that, under the cat's paw theory, "a defendant may be held liable for the racial animus of its non-decisionmaking employee when . . . that employee's discriminatory conduct causes a decisionmaking employee to take an injurious action against the plaintiff."  Ziyadat v. Diamondrock Hospitality Co., 3 F.4th 1291, 1298 (11th Cir. 2021).  Construing the facts and evidence in the light most

favorable to Plaintiff, that is what occurred here.  Thus, it is **RECOMMENDED** that Defendant's summary judgment motion ([Doc. 44]) be **DENIED** as to Plaintiff's Title VII and § 1981 race discrimination claim ([Doc. 1, Count I]).

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, the undersigned **RECOMMENDS** that Defendant's Motion for Summary Judgment [Doc. 44] be **DENIED**.  As this is a Final Report and Recommendation and there are no other matters pending before this Court, the Clerk is directed to terminate the reference to the undersigned.

**SO REPORTED AND RECOMMENDED**, this  3  day of December, 2024.

LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE