IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| RON BROWN, *Plaintiff,* v. LIFE UNIVERSITY, INC., *Defendant.* | Civ. Action No. 1:23-cv-02487-MLB-LTW |

**DEFENDANT'S OBJECTIONS TO THE MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION**

Defendant Life University, Inc. provides these objections to the Magistrate Judge's Non-Final Report and Recommendation, Doc. 61, recommending that this Court deny Life University's Motion for Summary Judgment, Doc. 44.

## BACKGROUND

This case arises from alleged discrimination and retaliation Ron Brown suffered when he was terminated from his position as a Grounds Supervisor by Life University. Doc. 1 ¶¶ 30, 36. The parties agree that these background facts are sufficiently supported and that they must be assumed for purposes of summary judgment: Life University's Grounds Department has a combination of long-term and temporary employees. Doc. 56-2 ¶ 2. The latter group are directly employed by an outside contractor with whom the University contracts for temporary workers, and they report their hours on paper to the contracting company. *Id.* ¶¶ 4–5. The former group enter their time in software provided by a different company, ADP, with which the University contracts to manage

payroll and time-and-attendance. *Id.* ¶ 6. That system uses individual login credentials and two-factor authentication to maintain records of who creates and modifies time entries. *Id.* ¶¶ 7–9; Doc. 44-4 ¶¶ 3–7; Doc. 47-1 at 123:19–25.

In August 2022, Brown reported to Collin Hilley (the head of the Grounds Department) and Kelly Reade that a temporary employee, Adamari Obregon, had been falsifying her written timesheets. Doc. 59-1 ¶ 39. Obregon was in a relationship with Brown's supervisor, Javier Cabanas, who was responsible for ensuring the accuracy of the temporary workers' timesheets. *Id.* ¶¶ 32–33. When confronted about the issue, on August 15, 2022, Obregon admitted to the violation and was terminated. Doc. 56-2 ¶¶ 23–24; Doc. 59-1 ¶ 43.

On August 11 and 12, 2022, Brown called out from work for health reasons. Doc. 56-2 ¶ 26. The week after Obregon was terminated, Cabanas reported to Hilley that Brown may have also entered false time entries. *Id.* ¶ 25. Hilley conveyed the report to Monica Ward, the University's Director of Employee Engagement, by email but did not identify the source of the report. *Id.* ¶ 27; Doc. 44-17 at 2. The email included text messages showing Brown calling out on August 11 and 12. Doc. 56-2 ¶ 27. Ward the confirmed the accuracy of the report by comparing the text messages to the records maintained by ADP's software. *Id.* ¶¶ 27–29; Doc. 44-4 ¶ 8. The records showed that on August 17, 2022, a person using Brown's account had entered 8 worked hours on August 12, 2022, leading Ward to understand that Brown had personally made false time entries. Doc. 56-2 ¶ 29–30; Doc. 44-4 ¶ 8. Ward

confirmed her understanding of the records with the University's HRIS Coordinator/IT Liaison. Doc. 44-4 ¶ 8.

On August 17, 2022, Hilley personally witnessed an interaction between Brown and a temporary employee, identified in the record only as "Chris," during which Brown expressed dissatisfaction with Chris's job performance. Doc. 56-2 ¶¶ 34–35. Following the interaction, Chris left work for the day, did not return the following day, and quit shortly thereafter. *Id.* ¶¶ 36–37. At the time, Hilley described this interaction as "ruthlessly berat[ing]." *Id.* ¶ 38. Hilley reported this interaction to Ward at the same time he relayed the reported timekeeping violation. Doc. 44-17 at 1–2. On August 22, 2022, Ward and Hilley decided that Brown should be terminated, and they met with him that same day to inform him of his termination. Doc. 56-2 ¶¶ 40–41.

In October 2022, Brown filed a charge of discrimination with the EEOC alleging that the University discriminated against him based on race and retaliated against him for complaining of race discrimination. Doc. 44-20. After the EEOC issued Brown notice of right to sue, Brown brought this suit against Life University, raising claims of race discrimination and retaliation, in violation of Title VII of the Civil Rights Act of 1965 and 42 U.S.C. § 1981. Doc. 1 ¶¶ 30, 36.

After discovery, Life University moved for summary judgment. *See* Doc. 44. Life University argued that Brown could not establish a *prima facie* case of discrimination or retaliation under the *McDonnell Douglas*[1] framework because, as to his discrimination claim, he could not identify a comparator

---

[1] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

3

employee, and, as to his retaliation claim, he could not show a sufficient causal connection between his complaint of discrimination and his termination. Doc. 44-1 at 9–13. Regardless, Life University argued that it terminated Brown for two non-discriminatory, non-retaliatory reasons: (1) he had falsified his time entry's in Life University's ADP timekeeping software, and (2) he had acted unprofessionally in berating Chris to the point that Chris quit his job. *Id.* at 13–16.

In response, Brown argued that he had established a *prima facie* case of retaliation because he had complained of discriminatory behavior by his supervisor, Cabanas, sometime in late July or August 2022, only a few weeks before his termination. Doc. 56 at 5–7. He further argued that a reasonable jury could find that both justifications for his termination were pretextual and that his termination was more likely motivated by retaliatory animus. *Id.* at 8–21. As to his interaction with Chris, Brown argued that a reasonable jury could find that Hilley lied about the interaction because several of the details of the interaction were purportedly contradicted by Brown's testimony about it. *Id.* at 12–13. As to the allegation that he misreported his time, Brown argued that there was sufficient evidence undermining the claim that he put in the false time, and that Life University did not do a sufficient investigation into the reported false time entries. *Id.* at 16–21. And Brown argued that retaliation was more likely the reason for his termination because Life University did not take, in his view, sufficient action in response to his complaints of discrimination and disciplined Brown for an unrelated policy violation that other employees also engaged in but were not disciplined for. *Id.* at 8–11.

4

As for his discrimination claim, Brown argued that he did not need to show a *prima facie* case under *McDonnell Douglas* because the record showed a "convincing mosaic" that Cabanas had racially discriminatory animus toward him and Hilley and Ward acted as 'cat's paws' for Cabanas. *Id.* at 21–25. That is, he argued that Cabanas reported Brown's false time entries to Hilley out of discriminatory animus, and the resulting investigation was insufficient to break the causal chain between that report and Brown's termination. *Id.* at 23–25.

The magistrate judge agreed with Brown and recommended denying Life University's motion for summary judgment. Doc. 61 at 34. Proceeding under *McDonnell Douglas*, the magistrate judge concluded that Brown made a *prima facie* case because he was terminated shortly after his most recent complaint of discrimination against Cabanas. *Id.* at 17–18. And the magistrate judge concluded that a reasonable jury could find Life University's proffered reasons for termination pretextual. As to the timekeeping violation, the magistrate judge said that Cabanas's report of the violation was "highly suspect" because it came shortly after Cabanas's girlfriend was terminated for a timekeeping violation that Brown had reported. And because the magistrate judge believed there was evidence that both Hilley and Ward were aware of that context, "[a] jury could find that they also must have known Cabanas's report against [Brown] was false, . . . but that they used the report as an excuse to get rid of a problematic employee." *Id.* at 20. And because Hilley and Ward terminated Brown the same day they received the report, "[b]ased on the swiftness of [Brown's] termination . . . a jury could reasonably infer that Hilley and Ward

were not genuinely concerned about whether Brown falsified his August 12 time entry." *Id.* at 22.

With respect to Brown's inappropriate interaction with Chris, the magistrate judge concluded that a reasonable jury could find that Hilley's description of the interaction was a lie, and, thus, that this reason was also pretextual. As the magistrate judge put it, "either [Brown] yelled, used profanity, let Chris in tears, and pushed him to quit his job with [Life University] or he did not." *Id.* at 24. And because the magistrate judge found that there was conflict evidence on each of these points, she was required to accept that Brown had not done those things. *Id.* On this basis, the magistrate judge rejected Life University's argument that Brown's resistance to this basis for his termination merely quarreled with Hilley's subjective interpretation of the interaction. *Id.* at 24–25.

Turning to Brown's discrimination claim, the magistrate judge concluded that Brown had introduced sufficient evidence to support his 'cat's paw' theory of discrimination. *Id.* at 31–34. The magistrate judge explained that "[c]onstruing the evidence in the light most favorable to [Brown], Cabanas used [Brown's] ADP login credentials to make a false time entry indicating that [Brown] worked a full eight-hour shift on August 12, 2022, and then reported to Hilley that [Brown] had falsified his time for that day. *Id.* at 32. Thus, the magistrate judge said, the dispositive question was whether Hilley and Ward independently investigated the violation of simply 'rubber stamped' Cabanas's report. *Id.* And for the same reasons the magistrate judge had found that the timekeeping violation may have been a pretextual basis for Brown's

6

termination, she concluded that the investigation was not sufficiently independent to defeat a 'cat's paw' theory. *Id.* at 33. As the basis for this supposed lack of independence, the magistrate judge noted only that Ward compared the ADP timekeeping records to text messages showing that Brown had not worked the reported eight hours and that the investigation took as little as half an hour. *Id.*

## ARGUMENT

The magistrate judge concluded that Brown had shown triable issues of fact as to both his retaliation and discrimination claims for three reasons, each of which was erroneous. First, the magistrate judge concluded that a reasonable jury could find Ward's decision to terminate Brown was pretextual because Brown's reported timekeeping violation came from Cabanas, whose motivations in making that report were suspect. But Brown failed to provide any evidence that Ward was aware the report came from Cabanas or that Cabanas had reason to want Brown terminated.

Second, the magistrate judge concluded that a reasonable jury could find that Hilley lied about an inappropriate interaction Brown had with a subordinate. But the magistrate judge's analysis took into account facts that are not supported by competent evidence, misapplied Eleventh Circuit precedent, and made unreasonable inferences in Brown's favor.

Third, the magistrate judge concluded that Brown had provided sufficient evidence that Ward and Hilley acted as a 'cat's paw' for Cabanas, because Ward's investigation of Brown's timekeeping violation was insufficiently lengthy. That analysis ignores the basic requirement of a 'cat's paw' theory—that the employer failed to independently verify the factual basis

7

of the biased reporter's allegation—and substitutes an ethereal sufficiency test that has no support in the law.

I. **The magistrate judge erred in concluding that Brown had provided sufficient evidence to support an inference that his termination was retaliatory**

The magistrate judge concluded that Brown showed the causation necessary to establish a *prima facie* case of retaliation because of "the close temporal proximity between [Brown's] protected activity and the challenged adverse action." Doc. 61 at 18. She went on to conclude that a reasonable jury could find that Hilley and Ward's proffered reasons for terminating him—his unprofessional behavior toward a subordinate and his timekeeping violates— were pretextual. *Id.* at 20–28.

Regarding the timekeeping violation, the magistrate judge explained that "Hilley and Ward were aware of [Brown's] complaint involving Obgregon's timesheet, its implications for Obregon, and the relationship between Obregon and Cabanas." *Id.* at 20. And because the timekeeping violation report came from Cabanas, this made it "highly suspect." *Id.* The fact that "Hilley and Ward refus[ed] to consider" Brown's claim that Cabanas falsified the timesheet using Brown's ADP login, the magistrate judge said, was "further evidence of pretext." *Id.* at 21.

As for Brown's interaction with Chris, the magistrate judge concluded that Brown's and Hilley's testimony conflicted on whether Brown "yell[ed], rais[ed] his voice, or use[d] profanity in his conversation with Chris," whether Chris cried, and whether Chris's reason for leaving his job was related to the conversation. Doc. 61 at 23–24. The magistrate judge concluded that this

8

conflict showed more than that Hilley "concluding [Brown] behaved inappropriately based on erroneous facts or a subjectively different interpretation of undisputed facts," and, instead, would allow a reasonable jury to conclude that Hilley had lied. *See id.* at 24.

### A. There is no evidence that Ward knew the facts purportedly undermining Cabanas's credibility

The magistrate judge's conclusion that the timekeeping violation was a pretextual justification relies on her conclusion that there was evidence to support a finding that Ward knew that (1) Brown had reported Cabanas and Obregon for their own timekeeping violations and (2) the timekeeping report against Brown came from Cabanas. But the record contains no competent evidence to support those findings.

In support of the first finding, the magistrate judge cited three paragraphs of Plaintiff's Statement of Additional Material Facts. *Id.* at 20 (citing Doc. 56-3 ¶¶ 39–40, 43). But those paragraphs support only the conclusion that Hilley and Kelly Reade—not Ward—were aware of Cabanas and Obregon's violations. Doc. 56-3 ¶ 39 ("Brown brought Obregon's falsified time sheet to Collin Hilley and Kelly Reade . . . ."), ¶ 40 ("Brown complained to Hilley and Reade that . . . when a Hispanic employee (Obregon) actually submitted falsified timesheets, Cabanas covered up for her."), ¶ 43 ("At Hilley's direction, Life University terminated Obregon on August 15, 2022."). There is no evidence in the record that Ward was involved in or even aware of these events at the time. As for the second finding, the magistrate judge cited no evidence, and there is none. Although Ward later learned that the report came from Cabanas, *see* Doc. 44-4 ¶ 8, Hilley's email to Ward reporting the violation

9

did not mention its source, Doc. 44-17. There is no evidence by which a reasonable jury could conclude that Ward was aware of these facts undermining the credibility of the accusation against Brown until Brown brought it up in his termination meeting. *See* Doc. 56-7 ¶ 55.

With the proper view of the contextual information Ward possessed at the time Life University decided to terminate Brown, the magistrate judge's analysis falls apart. The magistrate judge expressly premised her pretext analysis the fact that Cabanas's report against Brown was inherently suspect. *See* Doc. 6 at 20 ("A jury could find that [Hilley and Ward] must also have known Cabanas's report against [Brown] was false, given its highly suspect timing and source."), 21 ("Hilley and Ward's refusal to consider the information provided by [Brown] casting doubt on Cabanas's report, *given the suspect nature of the report to begin with*, is further indication of pretext." (emphasis added)). But Ward had no reason to suspect something was amiss with the report of Brown's false timekeeping. All she knew at the time was that Brown had called out sick on August 12 and that objective, computer-generated records, verified by Life University's IT liaison, showed that he had recorded working a full day. Doc. 44-4 ¶ 8.

Taken in this light, the only reasonable way for Ward to interpret Brown's termination-meeting protests was that he was making up excuses.[2]

---

[2] This is all the more true considering that the ADP time-entry system used two-factor authentication, Doc. 47-1 at 123:19–25, making Brown's claim that Cabanas entered the false time facially implausible. The magistrate judge construed Brown's testimony that Cabanas had Brown's "ADP login credentials" as raising a question of fact regarding whether "Cabanas had [Brown's] password *and access to his email*." Doc. 61 at 8–9 n.1 (emphasis added). Respectfully, this stretches Brown's declaration statement past its breaking point. Brown stated that he "gave Javier Cabanas his ADP login credentials so that he could show

And because both Ward and Hilley participated in the decision to terminate him, the lack of evidence that Ward's decision was pretextual dooms his retaliation claim. *See Ossman v. Meredith Corp.*, 82 F.4th 1007, 1021 (11th Cir. 2023) (when two decisionmakers participate in an employment decision, a plaintiff must show that both acted on an illegitimate motive).

### B. The magistrate judge erred in concluding that Brown had shown a genuine issue of fact regarding Hilley's interpretation of Brown's interaction with his subordinate

At summary judgment, Brown argued that a reasonable jury could find Hilley's claimed interpretation of Brown's interaction with Chris was false. The basis of this argument was his deposition and declaration testimony that "he did not yell, raise his voice, or use profanity during his conversation with Chris, that Chris did not cry, and that Chris left work immediately thereafter because his shift was over, but he returned to work a few days later and ultimately resigned for reasons unrelated to the conversation." Doc. 61 at 23–24 (citing Doc. 56-2 ¶¶ 34–38). The magistrate judge concluded that it was required to take each of these facts as true, and, thus, required to conclude that Hilley was lying about his interpretation of the interaction. *Id.* at 24. But, again, the

---

me how to enter my time into the system." Doc. 56-7. The statement makes no reference to Brown's email account, and no reasonable person would construe the phrase "ADP login credentials" to include the login credentials to an entirely different account. *See Eastman Kodak v. Image Tech. Servs., Inc.*, 504 U.S. 451, 468 n.14 (1992) ("Only *reasonable* inferences can be drawn from the evidence in favor of the nonmoving party." (quoting *H.L. Hayden Co. of N.Y., Inc. v. S. Photo Materials Co.*, 879 F.3d 1005, 1012 (2d Cir. 1989)) (cleaned up)); *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1301 (11th Cir. 2012) ("Although all justifiable inferences are to be drawn in favor of the nonmoving party, inferences based upon speculation are not reasonable." (cleaned up)). Regardless, the statement is incompatible with Brown's deposition testimony, at which he testified that he did not know how Cabanas gained access to his account. Doc. 46-1 at 31:21–23. Accordingly, the Court should disregard this statement. *See Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1306-07 (11th Cir. 2016).

11

magistrate judge accepted as true facts that lacked competent evidentiary support in the record. And, again, considering only the facts that are properly supported, the magistrate judge's reasoning falls apart.

First, Brown claimed that he did not "yell, raise his voice, or use profanity." *Id.* at 23. While Brown's use or not of profanity is an objective fact which he either did or did not do, whether he "yell[ed]" or "raise[d] his voice" is not. Whether a person's tone or volume was appropriate to the situation is a subjective determination. Thus, Brown's testimony cannot contradict Hilley's that the tone and volume of Brown's interaction was inappropriate (or, as Hilley described it at the time, "ruthlessly berat[ing]," *see* Doc 44-2 ¶ 38), even if Brown considers this interpretation unfair. *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010).

Second, Brown admits that Chris left work immediately after the interaction, but claims he came back a few days later and before he quit. Doc. 56-2 ¶ 36; Doc. 56-3 ¶¶ 60–61. Even if that's true, it is immaterial to the truth or falsity of Hilley's interpretation of events, because Brown does not claim, and no evidence indicates, that Hilley knew Chris returned. *See Alvarez*, 610 F.3d at 1266 ("The inquiry into pretext centers on the employer's belief, not the employee's belief and, to be blunt about it, not on reality as it exists outside of the decision maker's head.").

Finally, Brown claimed that Chris resigned for reasons unrelated to their interaction. Specifically, he claimed his "crew told him that Chris quit because he found a better paying job assignment elsewhere." Doc. 56-3 ¶ 62. Again, even if that's true, it is immaterial because Brown nowhere claims that Hilley

12

knew this information. But the magistrate judge was not even permitted to consider it as true in its own right because the evidence supporting it was not admissible to prove the statement's truth. Brown supported this statement solely with this statement from his declaration: "Later on, my crew told me that Chris quit his job because he found a better paying job assignment somewhere else." *Id.* (citing Doc. 56-7 ¶ 54). This statement contains two levels of hearsay—Chris to Brown's crew and Brown's crew to him—and the second layer of hearsay is by an unidentified declarant. It is thus inadmissible to prove the reason Chris quit his job. *Macuba v. Deboer*, 193 F.3d 1316, 1322–23 (11th Cir. 1999).

In sum, the only relevant, objective facts Brown's competent evidence undermines are (1) that Brown used profanity, and (2) Chris cried.[3] What's left undisputed is that Brown had an interaction with Chris during which Brown expressed dissatisfaction with Chris's work, Doc. 56-2 ¶ 35, Hilley considered this interaction to be "ruthlessly berat[ing]," *id.* ¶ 38, Chris left work immediately after, *id.* ¶ 36, to Hilley's knowledge, Chris never came back, *id.*, and Chris quit his job shortly thereafter.

With the proper factual base, this case is easily distinguishable from those that the magistrate judge cited to conclude that Brown had sufficiently

---

[3] The evidence does not, in truth, even support a conclusion or inference that Hilley lied about Chris crying during the conversation. His exact testimony was that Chris "left in tears" and that Brown was "aggressive towards Chris to the point of tears and leaving campus." Doc. 47-1 at 63:10, 76:10–11. Hilley never testified that Chris was 'crying' during the conversation. Similarly, although Hilley personally witnessed the interaction, he saw it through an office window and that he could not recall specific words Brown used but believed that he was using profanity. *Id.* at 62:8–10, 76:3–21. Brown's testimony thus also fails to provide evidence that Hilley lied about the specific language Brown used.

13

undermined Hilley's proffered reason for terminating him. In *Phillips v. Legacy Cabinets*, cited by the magistrate judge, the relevant decisionmaker asserted as the basis for termination that "arguing with him," "repeatedly calling him 'stupid,'" and "continu[ing] to make disrespectful and insubordinate comments about [him]" directly to the decisionmaker. 87 F.4th 1313, 1234 (11th Cir. 2023). The employee, however, denied making any of those statements at all. *Id.* The Eleventh Circuit rejected the argument that this constituted merely "recast[ing] the employer's proffered nondiscriminatory reasons or substitut[ing] [his] business judgement for that of the employer." *Id.*

Likewise, in *Vessels v. Atlanta Independent School System*, the decisionmaker asserted as one basis for failing to promote the employee that he had been unprofessional and failed to modify his behavior despite being made aware of its unprofessionalism. *See* 408 F.3d 763, 771 (11th Cir. 2005). But the employee "directly denie[d] that such conferences, or the incidents which precipitated them, even occurred." *Id.* Again, the Eleventh Circuit concluded that the employee had provided evidence undermining the decisionmaker's "sincere belief that the[] [unprofessional conduct] occurred." *Id.*

Here, of course, Brown does not deny that the interaction with Chris occurred. Doc. 56-2 ¶ 35. Nor does he deny the substance of that interaction or provide competent evidence undermining Hilley's belief that it caused Chris to quit his job. *Id.* ¶¶ 35–36. In fact, the only part of Hilley's description of the interaction that Brown's evidence directly contradicts is Hilley's contention

14

that the Brown raised his voice and "berated," *id.* ¶ 38, Chris. These are both subjective descriptions of Hilley's belief about the interaction, not verifiable facts. Thus, Brown's argument amounts to a rejection of Hilley's subjective interpretation of agreed facts, which is insufficient to establish falsity. *See Alvarez*, 610 F.3d at 1266.

## II. The magistrate judge erred in concluding that a reasonable jury could find that Ward's investigation of the timekeeping violation was insufficient

The magistrate judge, in its analysis of both Brown's retaliation and discrimination claims, put great weight on what it called Life University's "cursory" and "rubber stamp" investigation of Brown's timekeeping violations. Doc. 61 at 27, 32-33. The magistrate judge's conclusion that a reasonable jury could find that Life University's investigation was insufficiently independent was key to its analysis of Brown's retaliation claim, *see id.* at 21–22, 27–28, and a necessary element of its conclusion that Brown had established a jury question as to his 'cat's paw' theory of discrimination, *see id.* at 32–34. But the magistrate judge's analysis conflates speed with insufficiency, holding that the fact that an investigation was easy to complete necessarily means that it was not independent. That was error.

In some cases, the discriminatory animus of one who lacks the authority to terminate an employee may be imputed to the decisionmaker, if the plaintiff shows that the biased recommendation "directly resulted in the employee's discharge." *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331 (11th Cir. 1999). But in such cases the causation "must be truly direct." *Id.* Thus, the plaintiff must show "that the decisionmaker followed the biased

15

recommendation without independently investigating the complaint against the employee." *Id.* at 1332.

There is no requirement that an employer take any particular steps in this investigation, nor any support for the proposition that a brief investigation is inherently not independent. Nor is there any requirement that the decisionmaker investigate the bias of the recommender. *Harris v. Pub. Health Tr. of Miami-Dade Cnty.*, 82 F.4th 1296, 1302 (11th Cir. 2023). All that matters in analyzing a 'cat's paw' theory is whether the investigation "relie[d] on facts provided by the biased supervisor." *Staub v. Proctor Hosp.*, 562 U.S. 411, 421 (2011).

The undisputed facts here show that Ward did not rely on Cabanas's report that Brown had falsified his timesheets. Ward personally reviewed the automatically generated records showing who had entered Brown's time on August 12, 2023. Doc. 56-2 ¶¶ 28, 30. Those records—which, as explained above, Ward had no reason to doubt—showed that Brown had entered time inconsistent with his actual working hours. *Id.* ¶¶ 29–30. And Ward verified her understanding of the records with Life University's HRIS Coordinator/IT Liaison. Doc. 44-4 ¶ 8. The magistrate judge's analysis ignores these undisputed facts and concludes that a jury could find the investigation was not independent based solely on the fact that, construing the evidence in Brown's favor, the investigation took approximately half an hour. Doc. 61 at 33. Neither the magistrate judge nor Brown explains why the substance of the investigation was insufficient, nor does either cite any law for the proposition

that an investigation is insufficiently independent merely because it was easy for the investigator to verify the factual basis of the complaint.

The magistrate judge's analysis thus goes beyond the simple question of whether Life University "relie[d] on facts provided by the biased supervisor." *Staub*, 562 U.S. at 421. In so doing, the magistrate judge would require employers to ignore or look behind objective, computer-generated records and investigate potential sources of error, no matter how implausible those sources may be. But employers implement these systems for precisely this purpose: to provide reliable evidence of who entered and edited an employee's work hours and reduce potential sources of bias and error. The magistrate judge's rejection of Life University's independent investigation amounts to a rejection of its decision to implement such a system. That is an improper inquiry into Life University's business judgment. *See Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999) ("We are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision."); *Flowers v. Troup Cnty., Ga., Sch. Dist.*, 803 F.3d 1327, 1338 (11th Cir. 2015) ("Title VII does not allow federal courts to second-guess nondiscriminatory business judgments, nor does it replace employers' notions about fair dealing in the workplace with that of judges."). Absent evidence that Ward did not believe the ADP edit audit was accurate, Brown's 'cat's paw' discrimination theory and his retaliation claim fail. The magistrate judge erred in concluding otherwise.

## CONCLUSION

The magistrate judge erred in finding a jury question on whether Ward legitimately believed that Brown falsified his timesheets and whether that belief motivated her decision to terminate his employment. Likewise, the magistrate judge erred in concluding that Brown had sufficiently rebutted Hilley's claim to have terminated him based on an unprofessional interaction between Brown and a subordinate. And the magistrate judge erred in concluding that Hilley and Ward's investigation of Brown's timesheet violation was insufficiently independent, based solely on its brevity. Because Brown was required to show that neither Hilley nor Ward truly terminated Brown on the basis of either the timesheet violation or the inappropriate interaction with his subordinate, these errors require rejection of the Report and Recommendation. Accordingly, this Court should reject the Report and Recommendation and grant summary judgment in favor of Life University.

Respectfully submitted this December 17, 2024.

| | |
|---|---|
| | **HALL BOOTH SMITH, P.C**. |
| 191 Peachtree Street NE | |
| Suite 2900 | */s/ Russell A. Britt* |
| Atlanta, Georgia 30303 | RUSSELL A. BRITT |
| Phone: (404) 954-5000 | Georgia Bar No. 473664 |
| Fax: (404) 954-5020 | DYLAN MAGRUDER |
| rbritt@hallboothsmith.com | Georgia Bar No. 810717 |
| dmagruder@hallboothsmith.com | |
| | *Counsel for Life University, Inc.* |

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief was prepared in 13-point, Century Schoolbook type and does not exceed 25 pages, in compliance with Local Rules 5.1(B) and 7.1(D).

Dated December 17, 2024.

|  |  |
|---|---|
| | **HALL BOOTH SMITH, P.C**. |
| 191 Peachtree Street NE | |
| Suite 2900 | */s/ Russell A. Britt* |
| Atlanta, Georgia 30303 | RUSSELL A. BRITT |
| Phone: (404) 954-5000 | Georgia Bar No. 473664 |
| Fax: (404) 954-5020 | DYLAN MAGRUDER |
| rbritt@hallboothsmith.com | Georgia Bar No. 810717 |
| dmagruder@hallboothsmith.com | |
| | *Counsel for Life University, Inc.* |

## CERTIFICATE OF SERVICE

I hereby certify that foregoing brief was served on all counsel of record via CM/ECF as follows:

Matthew C. Billips
Benajmin A. Stark
P.O. Box 530092
Atlanta, Georgia 30353
matt@justiceatwork.com
bstark@justiceatwork.com

Dated December 17, 2024.

| | |
|---|---|
| 191 Peachtree Street NE<br>Suite 2900<br>Atlanta, Georgia 30303<br>Phone: (404) 954-5000<br>Fax: (404) 954-5020<br>rbritt@hallboothsmith.com<br>dmagruder@hallboothsmith.com | **HALL BOOTH SMITH, P.C**.<br><br>***/s/ Russell A. Britt***<br>RUSSELL A. BRITT<br>Georgia Bar No. 473664<br>DYLAN MAGRUDER<br>Georgia Bar No. 810717<br><br>*Counsel for Life University, Inc.* |